(154 P.3d 1154)
No. 95,403

STATE OF KANSAS, *Appellee*, v. KEVIN DEAN MALM, *Appellant*.

Opinion filed April 6, 2007.

*Sara Ellen Johnson*, of Kansas Appellate Defender Office, for appellant.

*Daryl E. Hawkins*, assistant county attorney, *Keith Hoffman*, county attorney, and *Phill Kline*, attorney general, for appellee.

Before RULON, C.J., MALONE and HILL, JJ.

MALONE, J.: Kevin Dean Malm appeals his convictions and sentences for conspiracy to manufacture methamphetamine and several related drug charges. Malm raises the following issues: (1) The district court erred by denying Malm's motion to suppress evidence seized as a result of an illegal traffic stop; (2) the district court erred by denying Malm's motion to suppress evidence seized from his residence pursuant to a search warrant; (3) Malm was denied a fair trial based upon prosecutorial misconduct; (4) Malm's convictions of unlawful acts relating to the manufacture of methamphetamine under K.S.A. 65-7006(a) and possession of drug manufacturing paraphernalia under K.S.A. 65-4152(a)(3) were multiplicitous; (5) the district court erred by classifying conspiracy to manufacture methamphetamine as a drug severity level 1 offense as opposed to

a drug severity level 4 offense; and (6) Malm's constitutional rights were violated when his sentence was based upon a criminal history classification not proven to a jury beyond a reasonable doubt.

On January 5, 2004, Diane Dowell, an asset protection manager at the Salina Target store, observed Malm purchase two packages of cold tablets containing pseudoephedrine. Target's policy at the time permitted a customer to purchase two packages of cold medicine from the shelf. Dowell continued to observe Malm on closed circuit surveillance as he approached a van in the Target parking lot. After a few minutes, Dowell observed a woman let Malm into the van.

After approximately 7 minutes, Dowell observed the woman exit the van and walk toward the Target store. On her way into the store, the woman deposited a white bag into a trash can. Dowell later examined the white bag and discovered that it contained four empty packages of cold tablets, two Target brand and two Sudafed brand. Dowell continued her surveillance of the woman inside the store, where she observed the woman pick up two packages of cold tablets and walk back and forth between the service desk and the checkout lanes. The woman ultimately went to the service desk and attempted to exchange a music compact disc (CD) for the two packages of cold tablets. The employee at the service desk would not allow the exchange because the woman did not have a receipt for the CD, and the woman left the store without making any purchases. Dowell observed the woman return to the van.

Dowell summoned the police, and Officers Lane Mangels, James Feldman, and Janelle Zimmerman, of the I-35/I-70 Drug Task Force, responded to the call. Feldman and Zimmerman, dressed in plain clothes and driving an unmarked vehicle, arrived at the store in time to follow the van as it left Target. Malm was driving the van, and the woman was in the passenger's seat. The officers ran a check on the van's license plate and discovered that it was registered to Connie S. Malm of Carlton, Kansas. The weather was snowy and icy that day, making the road conditions hazardous.

The officers followed the van and observed it stop at a gas station where both Malm and the woman entered and purchased ciga-

rettes. The officers continued to follow the van to Carlton, Kansas, approximately 20 miles from the Target store in Salina. At one point, Malm stopped the van, got out, and looked around as if to check to see if he was being followed. Just beyond Carlton, the van turned onto a dirt road. As the officers did not feel comfortable following the van down the dirt road due to weather-related driving conditions, the officers stopped in Carlton and waited.

A few minutes later, the van returned to Carlton and pulled up alongside the officers' vehicle on the driver's side so that the two vehicles were less than 12 inches apart. Malm rolled his window down and inquired whether the officers needed help. Zimmerman, who was driving, asked Malm to pull slightly forward so that she could exit the vehicle without dinging the van. As Malm was moving the van forward, Feldman exited the vehicle, drew his weapon down to his side, and identified himself as a police officer. Feldman was unsure whether the occupants of the van could see his weapon. Feldman asked Malm to stop the van, but the van continued to go forward slowly. Feldman told Malm to stop two more times before he finally did.

Once the van stopped, Feldman asked Malm to step out of the van and produce his driver's license, and Malm complied. Feldman asked Malm where he was currently living, and Malm replied that he was homeless and that the van belonged to his wife. Feldman asked Malm where his wife lived, and Malm replied that he did not know where she lived. Feldman observed a knife in between the driver's seat and the passenger's seat. When Feldman asked for consent to search the van, Malm refused.

Meanwhile, Zimmerman approached the passenger who identified herself as Connie Malm, Malm's wife and the registered owner of the van. Malm yelled to his wife not to talk to Zimmerman because they had a lawyer. Zimmerman asked Connie for permission to search the van, but she refused.

A few minutes later, Mangels, who had been tailing the officers and the van at some distance, also arrived on the scene. Mangels ran a warrant check on Malm and discovered an active arrest warrant for a probation violation based on a conviction of possession of methamphetamine. Based on the probation violation, Feldman

arrested Malm. The officers then searched the van, which they characterized as a search incident to the arrest. The officers found blister packs of tablets containing pseudoephedrine, an open box of coffee filters, a syringe, and several small baggies with white powder residue believed to be methamphetamine.

Based on this evidence, Mangels applied for a search warrant for the van and for the Malms' residence. The subsequent and more thorough search of the van uncovered additional items associated with the manufacture and use of methamphetamine. The search warrant affidavit for the Malms' residence recited the above information and also contained the following statement:

"[B]ased on the Malms' purchase and attempted second purchase of cold tablets containing pseudoephedrine hydrochloride at Target, the nervousness and paranoia of Kevin and Connie Malm in the city of Carlton, the discovery of blister packs containing tablets with pseudoephedrine, coffee filters and drug paraphernalia in the vehicle, the affiant believes that Kevin and Connie Malm were in possession of paraphernalia related to the manufacture of methamphetamine and were transporting those items from Salina to their residence in Carlton for the purpose of manufacturing methamphetamine. The affiant believes that Kevin and Connie Malm would have used the items found in the vehicle for the purpose of manufacturing methamphetamine at their residence if not for the swift intervention of law enforcement."

A magistrate authorized the search warrant, and upon its execution at the residence, the police found methamphetamine and a number of other objects associated with the manufacture and use of methamphetamine. Based on the evidence located in the Malms' van and residence, the State charged Malm with attempted manufacture of methamphetamine, conspiracy to manufacture methamphetamine, unlawful acts relating to the manufacture of methamphetamine, possession of methamphetamine, possession of drugs without a tax stamp, possession of drug manufacturing paraphernalia, and possession of drug use paraphernalia.

Malm filed a motion to suppress the evidence seized from the van, but after an evidentiary hearing the district court denied Malm's motion. Malm filed a subsequent motion to suppress the evidence seized from his residence. He argued the search warrant was not based on probable cause because the search warrant affidavit failed to allege a sufficient factual nexus between Malm's

suspected criminal activity and his residence. The district court denied this motion as well. Malm renewed his objections to the evidence at his jury trial, and the district court granted a continuing objection for the course of the trial.

Malm was found not guilty of attempted manufacture of methamphetamine, but he was found guilty of the remaining charges. Based on Malm's criminal history classification, the district court imposed a controlling sentence of 152 months' imprisonment. Malm timely appeals.

### Search of the van

Malm claims the district court erred by denying his motion to suppress the evidence seized from the van. Malm's only argument on appeal is that the officers lacked reasonable suspicion of criminal activity in order to justify stopping the van. He argues that all evidence obtained as a result of the stop should be suppressed as fruit of the poisonous tree.

"In reviewing a district court's decision regarding suppression, [an appellate] court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. [An appellate] court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. [Citation omitted.]" *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006). When the material facts relevant to the district court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress the evidence is a question of law over which an appellate court has unlimited review. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006).

The Fourth Amendment to the United States Constitution protects against " 'unreasonable searches and seizures' " of " 'persons.' " "Section 15 of the Kansas Constitution Bill of Rights provides protection identical to that provided under the Fourth Amendment to the United States Constitution. [Citation omitted.]" *State v. Morris*, 276 Kan. 11, 17, 72 P.3d 570 (2003). A seizure occurs when "there is the application of physical force" or when "there is a show of authority which, in view of all the circumstances

surrounding the incident, would communicate to a reasonable person that he or she is not free to leave [citation omitted] and the person submits to the show of authority [citation omitted]." 276 Kan. at 18-19. This is an objective standard. 276 Kan. at 18. Examples of a show of authority include "activation of sirens or flashers, a command to halt, a display of weapons, or attempt to control the ability to flee or the direction of travel during a chase." 276 Kan. at 20. If a reasonable person would feel free to decline an officer's requests, then the interaction between the officer and the person is characterized as a voluntary encounter. Voluntary encounters are not considered seizures and are not protected by the Fourth Amendment. 276 Kan. at 19.

The State characterizes the interaction between Malm and the officers as a voluntary encounter because Malm initially approached the officers and inquired if they needed help. This characterization ignores the remaining facts. Although the interaction between Malm and the officers began as a voluntary encounter, the nature of the encounter abruptly changed when Feldman exited his vehicle, identified himself as a police officer, covertly drew his firearm, and ordered the van to stop three times. As the van slowly crept away from the unmarked police vehicle, Feldman asserted his authority as a police officer to compel Malm to stop the van, and Malm submitted to Feldman's show of authority. Viewed objectively, the evidence indicates that Malm was seized for Fourth Amendment purposes.

The question then becomes whether the officers had reasonable suspicion of criminal activity to stop Malm based on the totality of the circumstances at the time that they seized him. K.S.A. 22-2402(1) provides: "Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and an explanation of such suspect's actions." This statute is a codification of the Fourth Amendment search and seizure principles expressed in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). In *Terry*, the United States Supreme Court determined that a law enforcement officer, without making an ar-

rest, was authorized to stop a suspect based upon "a series of acts [by the suspect], each of them perhaps innocent in itself, but which taken together warranted further investigation." 392 U.S. at 22.

In *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998), the Kansas Supreme Court, quoting the United States Supreme Court, has defined reasonable suspicion as " ' "a particularized and objective basis" for suspecting the person stopped of criminal activity.' [Citation omitted.] Something more than an unparticularized suspicion or hunch must be articulated. [Citation omitted.]" The court elaborated:

"Reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Both reasonable suspicion and probable cause are dependent upon the content of information possessed by the detaining authority and the information's degree of reliability. Quantity and quality are considered in the 'totality of the circumstances—the whole picture' that must be taken into account when evaluating whether there is reasonable suspicion. [Citation omitted.]" 263 Kan. at 735.

In arguing that the officers lacked reasonable suspicion to stop his van, Malm relies primarily on *State v. Schneider*, 32 Kan. App. 2d 258, 80 P.3d 1184 (2003). In *Schneider*, two defendants each purchased two packages of cold tablets and other items from the Salina Target. The Target loss prevention specialist notified the police about the purchases, and officers began to follow the defendants. The officers observed the defendants stop at a gas station where they did not make any suspicious purchases and then return to their vehicle and execute a turn without signaling. The officers continued to follow the defendants for 15 miles before making a stop. The officers asked the defendants to exit their vehicle and questioned them about the cold tablets and any possible involvement in methamphetamine production, in which the defendants denied participating. The officers then requested permission to search the defendants' vehicle, which the defendants denied. Nevertheless, the officers noticed contraband in the vehicle which they were only able to observe because one of the officers refused to allow a defendant to close the passenger door.

This court affirmed the district court's suppression of the evidence. 32 Kan. App. 2d at 265. This court questioned the pretex-

tual stop because of the significant amount of time that had passed between the alleged minor traffic violation and the ultimate stop. However, this court determined that even if the initial stop was justified, based upon the traffic infraction, the scope of the detention clearly went beyond that which is allowed in conducting a traffic stop. 32 Kan. App. 2d at 262-63. This court concluded that the simultaneous purchase by each defendant of two packages of cold tablets did not constitute reasonable suspicion of criminal activity and agreed with the district court that such a notion was "a little scary." 32 Kan. App. 2d at 264; see also *State v. Knight*, 33 Kan. App. 2d 325, 327-28, 104 P.3d 403 (2004) (a customer's purchase of two boxes of cold tablets, a six-pack of bottled water, and ordinary table salt did not justify a stop by the police).

There are certainly similarities between *Schneider* and the present case, mainly that each case involves two individuals each purchasing or attempting to purchase two packages of cold tablets. However, there are some important differences as well. Here, the two individuals did not purchase the cold tablets at the same time. Malm purchased two packages of cold tablets and went to the van in the parking lot. Approximately 7 minutes later, about the amount of time it would take to empty the tablets from the blister packs, Connie headed for the store. On her way into the store, she deposited four empty packages of cold tablets, including two Target brand packages, into a trash can. Connie then attempted to purchase two more packages of cold tablets in the unusual manner of trading in a music CD in exchange for the cold tablets. When she was unable to complete this transaction, she left the store without making any purchase and returned to the van. In this day and age, when it is well known that the main ingredient of methamphetamine is pseudoephedrine extracted from over-the-counter cold medication, the Malms' curious behavior was certainly suspicious enough to cause a trained asset protection store manager to alert the police.

Although the police may have been justified in immediately stopping the van as it left the Target store, it was reasonable for the police to follow the van to see if they could observe additional suspicious activity. Once the police began following the van, the

Malms did not return directly to their residence in Carlton. Instead, they took an indirect route, at one point turned down an isolated dirt road, and then turned around from there. At another point, Malm stopped the van, got out, and looked around as if to check to see if he was being followed. This behavior added to the mix of suspicious activity under the totality of the circumstances.

Although this is a close case, we agree with the district court that there was a particularized and objective reasonable suspicion of criminal activity sufficient to justify the police stopping Malm's van. Malm and his wife had engaged in "a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation" by the police. See *Terry*, 392 U.S. at 22. On appeal, Malm has only challenged the stop of his van as being illegal. Malm does not raise any issue regarding the subsequent search of the van except to claim that the evidence seized from the van should have been suppressed as fruit of the illegal stop. Because we agree that under the totality of the circumstances the officers had reasonable suspicion to stop the van, we conclude the district court did not err in refusing to suppress the evidence seized from the van.

## Search of the residence

Malm claims that even if the search of the van was legal, the search warrant issued authorizing the police to search his residence was not based on probable cause. Specifically, Malm asserts that the search warrant affidavit failed to allege a sufficient factual nexus between Malm's suspected criminal activity and his residence.

In *State v. Hicks*, 282 Kan. 599, Syl. ¶ 1, 147 P.3d 1076 (2006), our Supreme Court set forth the standard used by an issuing magistrate when evaluating an affidavit for a search warrant:

"In determining whether probable cause exists to support a search warrant, the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of any person supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

Our Supreme Court in *Hicks* further set forth the standard used by a reviewing court when a defendant challenges an affidavit for a search warrant:

"When an affidavit in support of an application for search warrant is challenged, the task of the reviewing court is to ensure that the issuing magistrate had a substantial basis for concluding probable cause existed. This standard is inherently deferential. It does not demand that the reviewing court determine whether, as a matter of law, probable cause existed; rather, the standard translates to whether the affidavit provided a substantial basis for the magistrate's determination that there is a fair probability that evidence will be found in the place to be searched. Because the reviewing court is able to evaluate the necessarily undisputed content of an affidavit as well as the issuing magistrate, the reviewing court may perform its own evaluation of the affidavit's sufficiency under this deferential standard." 282 Kan. 599, Syl. ¶ 2.

On review, a court's determination of the sufficiency of a search warrant affidavit must be determined from the four corners of the affidavit. *State v. Bowles*, 28 Kan. App. 2d 488, 492, 18 P.3d 250 (2001). Kansas courts prefer searches conducted under the authority of warrants to those conducted without the benefit of a warrant. Therefore, warrants and their supporting affidavits are to be interpreted in a common-sense, rather than a hypertechnical, fashion. *State v. Ames*, 222 Kan. 88, 92, 563 P.2d 1034 (1977).

The case law is clear that in order to obtain a warrant to search a suspect's residence, the affidavit must contain more than a description of the suspect's illegal activity. There must be some *nexus* between the illegal or suspicious activity described in the affidavit and the suspect's residence sufficient to establish a fair probability that contraband or evidence of a crime will be found in the residence. *State v. Ratzlaff*, 255 Kan. 738, 750, 877 P.2d 397 (1994).

In *State v. Doile*, 244 Kan. 493, 495, 769 P.2d 666 (1989), the defendant was arrested by the police in his automobile under suspicion that he was carrying drugs and driving while intoxicated. In a search incident to arrest the police found a mirror, a partially burned hand-rolled marijuana cigarette, and a bag containing a substance that was believed to be marijuana. After arriving at jail, the defendant's personal effects were searched and cocaine was found in a straw in his billfold. Based on an affidavit setting forth the items found on the defendant's person and a disclosure of a

prior conviction, the officers obtained a search warrant for the defendant's residence. In ruling the evidence should have been suppressed, the Supreme Court stated:

"The affidavit herein does not contain any factual allegations from which the judge could have found there was probable cause to believe contraband was in the residence. There was no allegation of any drug-related activity at the residence except for the sales almost five years earlier. There was nothing about the items seized from the vehicle or person from which one could conclude they were part of a stash at the residence. The judge must have concluded that finding the small amount of drugs on the defendant's person and in his auto was probable cause to search his residence simply because of the old conviction. This is an 'improper analysis of the totality of the circumstances' . . . ." *Doile*, 244 Kan. at 503.

In *State v. Probst*, 247 Kan. 196, 203, 795 P.2d 393 (1990), the defendant was arrested for distribution of methamphetamine and the police requested the issuance of a search warrant for her home. The affidavit supporting the search warrant described a sale of methamphetamine to an informant by a third party in front of the defendant's residence. The affidavit also contained an informant's statement that the defendant was involved in a drug ring and a statement that the defendant had been convicted of possessing methamphetamine 15 months earlier. Our Supreme Court concluded this was insufficient information linking drug trafficking to the defendant's residence because the sale of methamphetamine had occurred in front of her residence without the defendant being involved. 247 Kan. at 201.

In another case, *State v. Longbine*, 257 Kan. 713, 714, 896 P.2d 367 (1995), an affidavit to search the defendant's residence stated the defendant was part of a marijuana distribution ring. The affidavit contained no allegations that sales or possession of marijuana had taken place at the residence, but only that the defendant was making phone calls from his residence to a known drug dealer. Our Supreme Court affirmed the district court's determination that the affidavit failed to state a fair probability that contraband would be found at the defendant's residence. The *Longbine* court stated: "[A]n affidavit for a search warrant that gives an impression but fails to state facts that support probable cause to believe that contraband will be found at the place to be searched is insufficient to

buttress a finding of probable cause by the issuing magistrate." 257 Kan. at 720.

Here, the warrant for searching Malm's residence consisted of recounting the incident at Target; Malm's suspicious driving from the Target store to Carlton; the exchange between Zimmerman, Feldman, and the Malms; the search of Malm's van, which uncovered blister packs of tablets containing pseudoephedrine, a syringe, baggies, and coffee filters; and Malm's 2004 conviction of possession of methamphetamine. There was no indication that the conviction was in any way related to Malm's residence. The affidavit also contained information that in 2002 Malm was involved in selling anhydrous ammonia from the coop elevator where he worked and that Malm was known in the community as a methamphetamine cook. Finally, the affidavit contained boilerplate language about clandestine methamphetamine laboratories and the evidence that is usually found at such locations.

The State attempts to establish a nexus between this evidence and Malm's residence by maintaining that Malm had avoided returning to his residence because he believed the police might be following him. The State contends that Malm was hiding the location of his residence because he knew that he had contraband at his residence that might be discovered if he led the police to his residence. The evidence supporting the State's interpretation of Malm's motives is that Malm turned onto the snowy country road leading out of Carlton rather than heading directly home on the afternoon of the encounter. At one point, Malm stopped the van, got out, and looked around as if to check to see if he was being followed. Also, Malm lied to the police about the location of his residence, stating that he was homeless and that he did not know where his wife lived.

Malm counters the State's arguments by noting that the officers did not have any reliable information that Malm was headed home after purchasing the cold tablets at Target and that the officers only guessed at Malm's destination. Malm points out that his residence had never been under surveillance and the officers had no specific knowledge that Malm used his residence to manufacture methamphetamine, either at the time the search warrant was executed

or on prior occasions. The officers also had no knowledge of any drug sales at Malm's residence.

*Doile, Probst,* and *Longbine* make it clear that there must be some nexus between the illegal or suspicious activity described in a search warrant affidavit and the suspect's residence sufficient to establish a *fair probability* that contraband or evidence of a crime will be found in the residence. Although the search warrant affidavit in Malm's case contained some evidence of a nexus, the evidence was primarily speculative. There was no connection between Malm's suspicious activity on January 5, 2004, and Malm's residence other than the allegation that Malm was avoiding returning to his residence. Although this behavior may have added to the mix in establishing *reasonable suspicion* for the police to stop Malm's van, the evidence was insufficient to establish *probable cause* for the police to search his residence. Otherwise, a nexus to the suspect's residence could be established in almost every case where the suspect is arrested while driving a vehicle, rendering this important requirement for probable cause almost meaningless. We conclude that under the totality of the circumstances, the magistrate did not have a substantial basis to issue a search warrant for Malm's residence because there was an insufficient nexus between Malm's suspected criminal activity and his residence.

The State argues that even if the search warrant affidavit failed to establish probable cause to search Malm's residence, the officers reasonably relied on the warrant and searched the residence in good faith. In *United States v. Leon,* 468 U.S. 897, 918-22, 82 L. Ed. 2d 677, 104 S. Ct. 3405, *reh. denied* 468 U.S. 1250 (1984), the United States Supreme Court held that the Fourth Amendment exclusionary rule should not be applied to bar evidence obtained by officers acting in good faith in reasonable reliance on a search warrant issued by a detached and neutral magistrate, even though the warrant is ultimately found to be invalid. The *Leon* court, however, determined that the exclusionary rule still applies in cases where (1) the judge or magistrate issuing the warrant was deliberately misled by false information; (2) the judge or magistrate wholly abandoned his or her detached and neutral role; (3) the warrant was so lacking in specificity that the officers could not

determine the place to be searched or the things to be seized; or (4) there was so little indicia of probable cause contained in the affidavit that it was entirely unreasonable for the officer to believe the warrant was valid. 468 U.S. at 923.

In adopting the "good faith exception" in *Leon*, the United States Supreme Court expressed a "strong preference" for the use of warrants by police in conducting a search. 468 U.S. at 914. The court further noted that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." 468 U.S. at 916. Thus, suppressing evidence seized by law enforcement officers acting in good faith in reasonable reliance on a search warrant signed by a detached and neutral magistrate does not further the purpose of the Fourth Amendment exclusionary rule. 468 U.S. at 916-17.

Here, Malm does not allege that the magistrate issuing the warrant was deliberately misled by false information. There is also no allegation that the magistrate wholly abandoned his detached and neutral role. Clearly, the warrant was specific enough that the officers could determine the place to be searched and the things to be seized. Also, Malm does not argue there was so little indicia of probable cause contained in the search warrant affidavit that it was unreasonable for the officers to believe the warrant was valid. Under these circumstances, the *Leon* good faith exception would generally apply to uphold the search of Malm's residence.

In arguing that the *Leon* good faith exception is not applicable, Malm relies on *Doile*. As previously discussed, the court in *Doile* determined there was not a sufficient nexus between the drugs and paraphernalia found in the defendant's car and the defendant's residence. The court went on to hold that the search could not be saved by the *Leon* good faith exception. 244 Kan. at 502-03. In reaching this conclusion, the court acknowledged that none of the four exceptions to *Leon* were applicable under the facts of the case. Nevertheless, the court refused to uphold the search, quoting a passage from *Leon* that " 'reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause.' " *Doile*, 244 Kan. at 502.

The court's reasoning in *Doile* is somewhat curious because the *Leon* good faith exception is only triggered in cases where a court subsequently determines that the search warrant affidavit fails to establish a substantial basis for probable cause. This is why we have the *Leon* good faith exception in the first place. As long as the evidence does not support one of the four instances when *Leon* does not apply, it would seem that the good faith exception should apply in any case when evidence is obtained by law enforcement officers acting in good faith in reasonable reliance on a search warrant signed by a detached and neutral magistrate. As previously stated, § 15 of the Kansas Constitution Bill of Rights provides protection identical to that provided under the Fourth Amendment to the United States Constitution. *State v. Morris*, 276 Kan. 11, 17, 72 P.3d 570 (2003).

In any event, the facts of this case are distinguishable from the facts of *Doile*. In *Doile*, there was *absolutely no evidence* establishing a nexus between the defendant's criminal activity and his residence which was ultimately searched based upon the warrant. Here, there was some evidence of a nexus between Malm's criminal activity and his residence, mainly that Malm was attempting to avoid leading the officers to his residence and that Malm lied to the officers concerning the location of his residence. As we have previously concluded, this evidence was too speculative to establish a fair probability that contraband or evidence of a crime would be found at Malm's residence. However, the search warrant affidavit was not completely devoid of any evidence of a nexus, which was the situation in *Doile*. As is evident from the concurring opinion filed herein, reasonable minds can differ whether the search warrant for Malm's residence was supported by probable cause. This is precisely the type of situation in which the *Leon* good faith exception was intended to be applied.

In summary, there was no evidence in this case indicating that the officers lacked good faith in searching Malm's residence. The officers applied for a warrant before attempting the search, as is the favored practice. The officers acted in reasonable reliance on the search warrant and could not have been expected to second guess the magistrate's determination that the search was legal.

None of the four exceptions to the *Leon* good faith exception are applicable under the facts. Suppression of the evidence seized from Malm's residence would not further the purpose of the exclusionary rule. We conclude that although the search warrant affidavit failed to establish probable cause, the search of Malm's residence was saved by the *Leon* good faith exception. Accordingly, the district court did not err in denying Malm's motion to suppress the evidence seized from his residence.

### Prosecutorial misconduct

Next, Malm claims he was denied a fair trial based upon prosecutorial misconduct. Specifically, Malm claims the prosecutor elicited testimony from a witness that Malm had invoked his right to legal counsel, in violation of *Doyle v. Ohio*, 426 U.S. 610, 617-18, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976).

Malm's claim is based on the following exchange between the prosecutor and Officer Feldman on direct examination:

"Q. What was Mr. Malm's demeanor when you were conversing with him?
"A. It seemed all right. He wasn't angry or—he was calm, fairly decent.
"Q. How long did this conversation take place with him?
"A. About 15 minutes.
"Q. During that time frame was Mr. Malm ever saying anything to his wife, Connie Malm?
"A. Yes.
"Q. What was he saying to her?
"A. *He started yelling at her and said that they had a lawyer—*
    "[Defense counsel]: Objection, Your Honor.
    "THE COURT: Come forward. (Proceedings at the bench by Court and counsel.)
    "[Defense counsel]: He's about to elicit a statement where the defendant is calling out to his wife indicating they have an attorney, to remain silent, basically, demanding an indication of first [*sic*] amendment rights. That's not admissible.
    "[Prosecutor]: Well, my answer to that is, *he's not in custody. This is a spontaneous statement he's making to his wife* in the presence of a law enforcement officer. However, just abundance of caution, I will not pursue it any further.
    "THE COURT: Question withdrawn." (Emphasis added.)

The State argues that because defense counsel failed to request a formal ruling on the objection and the prosecutor withdrew the question, this issue is not preserved for appeal. However, Malm's

counsel raised a timely objection to the evidence. Also, the jury heard the brief testimony about Malm invoking his right to legal counsel and the judge did not instruct the jury to disregard this testimony. In any event, a contemporaneous objection to alleged prosecutorial misconduct is not required in order to preserve the issue for appeal; an appellate court will apply the same standard of review regardless of whether the defendant lodged an objection. *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006).

Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing or eliciting the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. 280 Kan. at 779.

In the second step of the analysis, the appellate court considers three factors:

"(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors, unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman*[*v. California*], 386 U.S. 18[, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial)], have been met. [Citations omitted.]" 280 Kan. at 780.

Here, Malm is incorrect that the prosecutor's questioning constituted a *Doyle* violation. According to *Doyle*, it is constitutionally impermissible for the State to elicit evidence at trial of an accused's post-*Miranda* silence. 426 U.S. at 618. Here, as the prosecutor correctly informed the judge at trial, the officers had not yet taken Malm into custody or *Mirandized* him at the time he made his statement about having counsel. Thus, Malm's invocation of his right to an attorney was not protected by the Fifth Amendment to the United States Constitution. *Doyle*, 426 U.S. at 617-18.

Even if the prosecutor's specific question was somehow improper, the prosecutor's conduct was neither gross nor flagrant. Upon being challenged by the defense, the prosecutor withdrew the question and resumed examination of the witness without reference to Malm's comments about his attorney. The prosecutor's conduct did not show any ill will. Furthermore, given the amount of evidence presented at trial supporting Malm's guilt, the prosecutor's question had little, if any, likelihood of having changed the result of the trial. Thus, Malm's allegation of prosecutorial misconduct is unfounded.

### *Multiplicitous convictions*

Malm claims that his conviction of unlawful acts relating to the manufacture of methamphetamine under K.S.A. 65-7006(a) and his conviction of possession of drug manufacturing paraphernalia under K.S.A. 65-4152(a)(3) were multiplicitous because both convictions could have been based on possession of the same item: lithium metal. The State concedes that multiplicity issues may be raised for the first time on appeal. *State v. Groves*, 278 Kan. 302, 303-04, 95 P.3d 95 (2004). The issue of whether convictions are multiplicitous is a question of law subject to unlimited review. *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

In *Schoonover*, the court developed a test to apply to multiplicity issues. First, a court must consider whether the convictions are based upon the same conduct. If not, the multiplicity analysis ends. 281 Kan. at 496. If based on the same conduct, the court must then consider whether the convictions are based upon a single statute or multiple statutes. If the convictions are based upon different statutes, such as in the present case, the convictions are multiplicitous only when the statutes upon which the convictions are based contain an identity of elements. The court clarified that the same-elements test is the only test to determine multiplicity arising from convictions of separate statutes. 281 Kan. at 497-98.

The Kansas Supreme Court has also announced that the test for multiplicity is the strict elements test without considering the facts that must be proven to establish those elements. *State v. Patten*, 280 Kan. 385, Syl. ¶ 4, 122 P.3d 350 (2005). Furthermore, our

Supreme Court has explained that two crimes may have the same elements for sentencing purposes, but not for the purpose of conducting a multiplicity analysis. *State v. Fanning*, 281 Kan. 1176, 1182, 135 P.3d 1067 (2006).

K.S.A. 65-7006(a) prohibits the possession of "ephedrine, pseudoephedrine, red phosphorus, lithium metal, sodium metal, iodine, anhydrous ammonia, pressurized ammonia or phenylpropanolamine, or their salts, isomers or salts of isomers with intent to use the product to manufacture a controlled substance."

K.S.A. 65-4152(a)(3) provides: "No person shall use or possess with intent to use: . . . (3) any drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, sell or distribute a controlled substance in violation of the uniform controlled substances act."

In the instructions to the jury in Malm's case, Malm's possession of lithium metal was included as a possible basis for establishing both the charge of unlawful acts relating to the manufacture of methamphetamine and the charge of possession of drug manufacturing paraphernalia. Malm did not object to the instructions at trial. In any event, the test to determine multiplicity does not depend upon the facts that were proven at trial relative to the charges. Although Malm's convictions of the two separate offenses could have both been based on his possession of lithium metal under the facts of this case, that does not mean that the convictions are multiplicitous. A comparison of K.S.A. 65-7006(a) with K.S.A. 65-4152(a)(3) indicates that the elements of the two statutes may overlap, but they are not identical. The identity of elements is the only test for determining multiplicity. *Schoonover*, 281 Kan. at 497-98. Accordingly, Malm's claim that the convictions were multiplicitous is without merit.

*Classification of conspiracy to manufacture methamphetamine*

Malm also contends the district court erred by classifying his conviction of conspiracy to manufacture methamphetamine as a drug severity level 1 offense rather than as a drug severity level 4 offense. Malm argues that the conduct proscribed by K.S.A. 65-

4159(a) is identical to the conduct proscribed by K.S.A. 65-4152(a)(3). Under the reasoning of *State v. McAdam*, 277 Kan. 136, 83 P.3d 161 (2004), Malm contends he should have been sentenced to the lesser of the penalties prescribed by the two statutes, a drug severity level 4 offense.

The State argues that Malm failed to make a contemporaneous objection and, consequently, this issue is not properly before the court on appeal. Appellate courts do not generally address new issues on appeal. However, K.S.A. 21-4721(e)(3) gives appellate courts jurisdiction to review a claim that the sentencing court erred in ranking the crime severity level. See *Fanning*, 281 Kan. at 1178. Interpretation of a sentencing statute is a question of law, and the appellate court's standard of review is unlimited. *State v. Walker*, 280 Kan. 513, 515, 124 P.3d 39 (2005).

In *Fanning*, the Kansas Supreme Court rejected an argument similar to Malm's argument, only *Fanning* addressed an attempt to manufacture methamphetamine instead of conspiracy to manufacture methamphetamine. The court determined that although the elements of attempt to manufacture methamphetamine in violation of K.S.A. 65-4159(a) are nearly identical to the elements of possession of drug manufacturing paraphernalia in violation of K.S.A. 65-4152(a)(3), the elements of the two statutes are not completely identical for sentencing purposes. Thus, the court held that attempt to manufacture methamphetamine is properly classified as a drug severity level 1 offense rather than as a drug severity level 4 offense. 281 Kan. at 1183-84.

In *State v. Miles*, 35 Kan. App. 2d 211, 214-15, 130 P.3d 1198 (2005), *rev. denied* 280 Kan. 988 (2006), this court specifically rejected a defendant's argument that conspiracy to manufacture methamphetamine should be classified as a drug severity level 4 offense. This court determined that the conduct proscribed by K.S.A. 65-4159(a) is different from the conduct proscribed by K.S.A. 65-4152(a)(3). Following the reasoning of *Fanning* and *Miles*, we conclude the district court did not err by classifying Malm's conviction of conspiracy to manufacture methamphetamine as a drug severity level 1 offense rather than as a drug severity level 4 offense.

### *Apprendi issue*

Malm's final argument is that the district court violated his constitutional rights under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), by sentencing Malm based upon a criminal history classification not proven to a jury beyond a reasonable doubt. Malm concedes the Kansas Supreme Court has already decided that using a defendant's prior criminal history in sentencing a defendant under the Kansas Sentencing Guidelines Act does not violate a defendant's constitutional rights under *Apprendi*. *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002). This court is duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its previous position. *State v. Beck*, 32 Kan. App. 2d 784, 788, 88 P.3d 1233, *rev. denied* 278 Kan. 847 (2004). There is no indication that the Kansas Supreme Court is departing from its position in *Ivory*. Thus, Malm's sentence as imposed by the district court did not violate his constitutional rights under *Apprendi*.

Affirmed.

RULON, C.J., concurring: I concur with the majority's decision in this case. However, as to the search of Kevin Dean Malm's residence, I find that the search warrant affidavit alleged a sufficient factual nexus between Malm's suspected criminal activity and his residence. Accordingly, I conclude the search warrant was supported by probable cause, and it is unnecessary to rely on the "good faith exception" enunciated in *United States v. Leon*, 468 U.S. 897, 918-22, 82 L. Ed. 2d 677, 104 S. Ct. 3405, *reh. denied* 468 U.S. 1250 (1984), in order to uphold the search of Malm's residence.