(190 P.3d 283)
No. 98,973

STATE OF KANSAS, *Appellant,* v. TONY L. BOTTOM and
SARA J. O'BRIEN, *Appellees.*

Opinion filed August 22, 2008.

*Gary L. Foiles,* assistant county attorney, and *Paul J. Morrison,* attorney general, for appellant.

*Russ Roe,* of Onaga, for appellee Tony L. Bottom.

*Shawna R. Miller,* of Holton, for appellee Sara J. O'Brien.

Before HILL, P.J., PIERRON and GREEN, JJ.

GREEN, J.: The State appeals from the trial court's pretrial judgment suppressing all evidence seized by law enforcement officers executing two search warrants at the home of Tony Bottom and Sara O'Brien (collectively appellees). The first issue is whether the information contained in the first search warrant was so stale as to lack probable cause for issuance of the search warrant. Second, if it is determined that the first search warrant was not based upon probable cause, could the items seized under the first search warrant be admitted under the *Leon* good-faith exception to the warrant requirement? Of these two issues, we find the second issue controlling. Accordingly, we reverse the trial court's judgment suppressing all the evidence seized and remand for further proceedings.

On the afternoon of November 27, 2006, Detective Al Dunn met with Nancy Tobias and Dennis Tobias, K.T.'s maternal grandparents, regarding a report of child abuse to K.T., a 5-year-old child, by K.T.'s father, Tony Bottom. K.T. was 5 years old when Dunn met with the Tobiases. During the meeting, Nancy told Dunn that Bottom spanked K.T. and two other young girls with a board for lying to him. Nancy gave Dunn a photograph showing a small child's buttocks covered with bruising.

Dennis stated that their daughter, Terri Tobias, had told them that Bottom had caused the bruising when K.T. stayed with him from August 2, 2006, to August 4, 2006. Apparently, when Terri picked up K.T. on August 4, 2006, Bottom's girlfriend, Sara O'Brien, and Bottom's sister told Terri about the bruises. O'Brien also told Terri that Bottom had almost killed her a couple of days

before but that she did not think Bottom would actually kill her. When Nancy heard about the bruising to K.T., she looked at K.T.'s buttocks and photographed the bruising. According to Nancy, K.T. told her that Bottom had spanked her with a board.

Nancy showed Dunn temporary custody papers giving Dennis temporary custody of K.T. until Christmas break when K.T. was scheduled to go with Bottom. A custody hearing had also been scheduled for December 27, 2006. No one had had contact with K.T.'s mother since November 11, 2006.

Also present during the meeting with Dunn was Donna Cox, who lived with Dennis. Cox stated that K.T. had not complained of any injuries or made any statements about being spanked before leaving with Bottom. According to Cox, K.T. had said that Bottom had spanked her and had showed Cox the bruises after she returned from visiting him.

On November 29, 2006, Alyce Goin, who was a Department of Social and Rehabilitation Services (SRS) worker, interviewed K.T. at the Wamego Police Department concerning the alleged abuse. When asked about being spanked, K.T. stated that she and another girl were spanked by O'Brien for playing with fishing poles. K.T. said that they were spanked with the "Booty Buster." When asked to draw the "Booty Buster," K.T. drew a picture that resembled a ping-pong paddle. During an earlier conversation between Bottom and Goin, Bottom had admitted to using a ping-pong paddle to spank K.T. when she would lie. K.T. told Goin that she had been spanked a second time with the "Booty Buster" by Bottom. According to K.T., Bottom broke the "Booty Buster" during her spanking. K.T. said that Bottom then made another "Booty Buster" and spanked her again. K.T. was unable to tell Goin the exact date when the spanking occurred but did state that she was wearing a bathing suit and that it happened before school started. K.T. first said that it happened in the summer and then said it happened in the fall.

On the evening of November 29, 2006, Dunn went to Bottom's home to speak with Bottom and O'Brien. When no one answered the door, Dunn left a business card in the door. Dunn again went to Bottom's residence on December 1, 2006, and December 6,

2006, in an attempt to contact Bottom. According to Dunn, there were dead animal carcasses around Bottom's residence each time he was there. In addition, Dunn saw several areas on the property where there appeared to be discarded items, junk, or trash. Dunn did not see a burn barrel or trash can used to discard household trash.

Bottom tried to call Dunn on December 2, 2006, but Dunn was off work. Dunn left messages on Bottom's telephone asking Bottom to speak with him. According to Dunn, Russ Roe, Bottom's attorney in this case, contacted Dunn at the sheriff's office and said that Bottom was in his office stating that Dunn had been trying to speak with Bottom. Dunn explained why he needed to speak with Bottom. Roe said that he would have Bottom call Dunn. Dunn again tried to call Bottom, but he received no response.

Based on all of this information, Dunn applied for and was issued a search warrant for Bottom's residence. Dunn applied for the search warrant at approximately 9:30 p.m. on December 7, 2006. The search warrant authorized the officers to look for ping-pong paddles commonly referred to as the "Booty Buster"; "any board fashioned as such a paddle, striking instrument or any other device used to inflict abuse [] or punishment of children"; and "any pictures or photographs of child abuse to include computer discs, floppy discs, film negatives and digital memory sticks, electronically stored media." Law enforcement officers executed the search warrant at around 10:13 p.m. on December 7, 2006. During the search, officers seized a wooden paddle marked "BB II" from Bottom's residence.

While executing the search warrant, officers discovered what appeared to be drugs and drug paraphernalia items in plain view in Bottom's home. Officers also discovered electronic scales under a shelf in Bottom's home. In addition, Detective Darren Brown knew that Bottom had a prior conviction for possession of drug paraphernalia. Based on this information, Brown applied for and was issued a second search warrant to search for evidence of drugs in Bottom's home. Brown applied for the second search warrant at approximately 11:53 p.m. This second search warrant was executed at approximately 12:30 a.m. on December 8, 2006. Officers

seized drugs and various items of drug paraphernalia during the second search.

Bottom was charged with one count of possession of methamphetamine, two counts of possession of drug paraphernalia, one count of possession of marijuana, one count of criminal use of weapons, and two counts of endangering a child. In a separate criminal case, O'Brien was charged with one count of possession of methamphetamine, one count of possession of drug paraphernalia, one count of possession of marijuana, and two counts of endangering a child. Additionally, in two other criminal cases, Bottom and O'Brien were each charged with one count of abuse of a child.

Both O'Brien and Bottom moved to suppress the evidence obtained during both searches of Bottom's and O'Brien's residence. Specifically, the appellees argued that the information in the affidavit for the first search warrant was stale and, therefore, insufficient to establish probable cause for the issuance of the warrant. The appellees further argued that because the second search warrant was based solely on information discovered during the execution of the first search warrant, the second search warrant must also fail.

After conducting an evidentiary hearing on the appellees' motions to suppress, the trial court found that the evidence in the first search warrant application was so stale that it was without value and should not have been considered. As a result, the trial court determined that the first search warrant application did not provide probable cause for issuance of a search warrant. Moreover, the trial court found that the magistrate issuing the first search warrant abandoned his role as a neutral magistrate and that the search warrant was so facially invalid that no law enforcement officer could have relied upon it in good faith. The trial court further found that the second search warrant was based almost solely on information developed during the execution of the first search warrant. As a result, the trial court granted the appellees' motions to suppress the evidence obtained during the execution of the two search warrants.

*Did the Trial Court Err in Suppressing the Evidence?*

On a motion to suppress evidence, this court reviews the factual findings underlying the trial court's suppression decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those factual findings by a de novo standard. An appellate court does not reweigh the evidence. See *State v. Parker*, 282 Kan. 584, 588, 147 P.3d 115 (2006).

A. Were There Sufficient Facts in the First Search Warrant to Support Probable Cause?

First, the State argues that the trial court erred in finding that there were insufficient facts in the first affidavit for search warrant to provide probable cause to search the appellees' residence.

In determining whether probable cause exists to support a search warrant, the task of the issuing magistrate is simply to make a practical, commonsense decision whether, based on all the circumstances in the affidavit, including the veracity and basis of knowledge of any person supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *State v. Hicks*, 282 Kan. 599, Syl. ¶ 1, 147 P.3d 1076 (2006).

When reviewing the magistrate's decision to issue a search warrant, the trial court and the appellate court must apply the following deferential standard of review:

"When an affidavit in support of an application for search warrant is challenged, the task of the reviewing court is to ensure that the issuing magistrate had a substantial basis for concluding probable cause existed. This standard is inherently deferential. It does not demand that the reviewing court determine whether, as a matter of law, probable cause existed; rather, the standard translates to whether the affidavit provided a substantial basis for the magistrate's determination that there is a fair probability that evidence will be found in the place to be searched. Because the reviewing court is able to evaluate the necessarily undisputed content of an affidavit as well as the issuing magistrate, the reviewing court may perform its own evaluation of the affidavit's sufficiency under this deferential standard." *Hicks*, 282 Kan. 599, Syl. ¶ 2.

Therefore, when reviewing the issuing magistrate's decision to issue a search warrant, this court conducts an independent analysis of the content of the affidavit for search warrant, but we need only

see enough to persuade us that there was a substantial basis for the magistrate's determination. See *State v. Fisher*, 283 Kan. 272, 300-01, 154 P.3d 455 (2007); *Hicks*, 282 Kan. at 611.

In this case, the trial court determined that the information contained in the affidavit for search warrant was too stale to provide probable cause for issuance of the search warrant. The trial court noted that there was no information in the affidavit for search warrant about a ping-pong paddle being in the appellees' house from August 2, 2006, to 4 months later when the search warrant was issued. Further explaining the reasons for its decision, the trial judge stated:

"I do believe the information was stale. And not only do I believe that but there's only one piece of information on August 2nd, 4th, whenever, I got spanked with a paddle. There's no other comments by the child that says I've been back since, I['ve] been hit since, I have seen the paddle fifteen times since, three times since, whatever else. . . . The child got . . . whipped with a paddle sometime in August. And that's four months ago. And I understand your argument about it being an item that one necessarily wouldn't get rid of and you may be correct but I think that is stale information and there [are] no other corroborating factors that go to help that out."

It is a basic principle that allegations of probable cause set forth in a search warrant affidavit must show that probable cause exists at the time the warrant is issued. Indeed, the United States Supreme Court spoke about staleness in a search warrant affidavit as early as 1932 in *Sgro v. United States*, 287 U.S. 206, 210, 77 L. Ed. 2d 260, 53 S. Ct. 138 (1932): "[I]t is manifest that the proof [contained in a search warrant affidavit] must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." As a result, the issuing magistrate must conclude that what law enforcement officers are searching for is presently at the location to be searched, not that it was there sometime in the past. "Probable cause existing at some time in the past will not suffice unless circumstances exist from which it may be inferred that the grounds continued to the time the affidavit was filed. [Citations omitted.]" *United States v. Neal*, 500 F.2d 305, 309 (10th Cir. 1974).

Arguing that the trial court wrongly concluded that the information contained in the affidavit for search warrant was too stale to support probable cause, the State cites two federal Tenth Circuit Court of Appeals cases where the mere passage of time did not render the information in an affidavit for search warrant too stale for consideration. See *United States v. Cantu*, 405 F.3d 1173, 1177 (10th Cir. 2005); *United States v. Riccardi*, 405 F.3d 852, 860-61 (10th Cir. 2005).

In *Cantu*, the court upheld an April 2003 search warrant of the defendant's car where drugs were found. The affidavit for search warrant contained information about five discrete episodes concerning the defendant: an August 2001 drug conviction; an April 2002 arrest where drugs were found in the defendant's car; an August 2002 arrest at a storage facility where drugs were found in the defendant's car; an April 2003 surveillance of the defendant driving to Texas based on a tip that the defendant received supplies for his drug operation in Texas; and an April 2003 surveillance of the defendant in which he drove to a remote location near a storage facility and was seen dragging a duffel bag out of a line of evergreen trees towards his car. The Tenth Circuit Court of Appeals determined that it was proper for the judge issuing the search warrant to consider the defendant's earlier arrests and conviction, particularly where the more recent events in the affidavit for search warrant refreshed the earlier episodes. The court pointed to the fact that the informant's tip leading to police surveillance provided some indication of continuing criminal activity and also to the similarity between the August 2002 arrest and the events leading to the April 2003 arrest as refreshing the earlier information.

*Cantu* is distinguishable from the instant case because in *Cantu*, the affidavit for search warrant outlined specific recent events that were highly suspicious and indicated ongoing criminal activity. Nevertheless, *Cantu* is instructive on the rule that the timeliness and relevance of information contained in an affidavit for search warrant cannot be judged solely on the passage of time:

"A search warrant may not issue if based upon information that has grown stale, i.e., information that no longer supports an affidavit's underlying assertion that the item sought will be found in the area or location to be searched. [Citation

omitted.] However, timeliness and relevance cannot be judged solely by the days of the calendar. [Citation omitted.] Rather, 'whether the information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized.' [Citation omitted.] When the circumstances suggest ongoing criminal activity, the passage of time recedes in importance. [Citation omitted.]" 405 F.3d at 1177.

This rule was applied in *Riccardi*, where the Tenth Circuit Court of Appeals upheld a search warrant to seize and search the defendant's computer. The court rejected the defendant's argument that a 5-year-old Kinko's receipt for copying of four Polaroid photographs to computer disks was too stale to support probable cause. The court noted that the receipt showed that the defendant had the desire and ability to convert pictures to a digital format which, based upon the affidavit for search warrant, is a common means by which child pornographers distribute and exchange their materials. The court, citing *United States v. Lamb*, 945 F. Supp. 441, 460 (N.D.N.Y. 1996), further noted that images of child pornography are likely to be kept by persons interested in those materials in their homes due to the difficult collection of the materials, the illegality of possessing the materials, and the severe social stigma such images carry. Looking to the other information in the affidavit for search warrant, the court stated that the proximity of the Kinko's receipt and the computer to hundreds of photographs of teenage males, many of which were pornographic, made it likely that some of them had been converted to a computer format, from which they could be distributed over the internet.

As discussed in *Riccardi*, the determination of whether evidence relating to possession of images of child pornography is too stale to support probable cause brings with it a unique rationale based on the nature of that particular criminal activity. This rationale is difficult to apply in the context of other criminal activity. Nevertheless, *Riccardi* illustrates that the question of staleness cannot turn solely on the passage of time between the information relied on and the issuance of the search warrant. Rather, the determination depends on the particular circumstances of the case, that is, " 'the nature of the criminal activity, the length of the activity, and

the nature of the property to be seized.' [Citation omitted.]" 405 F.3d at 860-61.

In *United States v. Schauble*, 647 F.2d 113, 116 (10th Cir. 1981), the Tenth Circuit Court of Appeals recognized that while the element of time is crucial to probable cause, the passage of time becomes less significant when the facts indicate activity of a protracted and continuous nature:

> "We concur with [the defendant's] position that 'the element of time is crucial to the concept of probable cause.' [Citation omitted.] But 'the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit.' [Citation omitted.] In resolving the question of staleness, the nature of the alleged criminal activity and the property to be seized must be considered. [Citations omitted.] 'Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time.' [Citation omitted.] This is particularly true if the property to be seized can be easily transported or consumed. On the other hand, 'where the affidavit properly recites facts indicating activity of a protracted and continuous nature . . . the passage of time becomes less significant,' and facts otherwise remote in time may retain their relevance. [Citation omitted.]"

Relying on *United States v. Myers*, 553 F. Supp. 98 (D. Kan. 1982), this court has set forth four factors to consider when analyzing whether the information relied upon to obtain a search warrant is stale:

> "The first is whether the criminal activity is continuous. The second is the time between the issuance of the warrant and the alleged criminal activity relied upon to establish probable cause. The third is the use of present or past tense verbs in the affidavit supporting a search warrant. Finally, the court looks at the likelihood the contraband would be removed from the location of the proposed search." *State v. Hemme*, 15 Kan. App. 2d 198, 203, 806 P.2d 472, *rev. denied* 248 Kan. 998, *cert. denied* 502 U.S. 865 (1991).

When considering all of the factors to determine whether an application for a search warrant depends upon stale information and, therefore, is not supported by probable cause, the trial court must ultimately find a nexus between the place to be searched, the property to be seized, and the criminal conduct. *Hemme*, 15 Kan. App. 2d 198, Syl. ¶ 2.

This case presents a close question. In order to establish probable cause to search Bottom's home for evidence of child abuse, the affidavit for search warrant needed to show that what the officers were searching for was presently at Bottom's home. There appeared to be only one specific spanking incident outlined in the affidavit for search warrant. This was the spanking incident that occurred in August 2006 and resulted in K.T.'s buttocks being covered with bruises. This incident occurred approximately 4 months before the search warrant was issued. Moreover, the information in the affidavit for search warrant indicates that Bottom realized that he was the suspect in a child abuse investigation by the time that officers executed the search warrant at his home. Before the officers searched Bottom's home, Bottom had tried to contact Dunn. Moreover, Bottom had visited an attorney who eventually spoke with Dunn and was told about the investigation. Based on this information, it would be reasonable to assume that Bottom would remove or dispose of any evidence, such as the paddle, that could incriminate him in the child abuse investigation.

On the other hand, some of the other information in the affidavit for search warrant indicated that the abuse was a continuous course of conduct by Bottom and that he would not readily dispose of the paddle. Bottom had previously admitted to the SRS worker that he spanked K.T. with a wooden ping-pong paddle when K.T. would lie. Moreover, Bottom had named the ping-pong paddle that he used to spank K.T. the "Booty Buster" and had gone so far as to make a second "Booty Buster" when the first one broke. As the State points out, Bottom's actions indicate that he intended to continue using this object to strike children and that he was not going to dispose of it after the spanking. In other words, Bottom's action in naming the wooden paddle and in making a second "Booty Buster" when the first one broke indicate that the specific incident of abuse occurring in August 2006 was not a limited, transitory event. Moreover, it would be reasonable to conclude that Bottom would not dispose of an object that he had made specifically for spanking and that he had named.

Nevertheless, we need not answer the close question of whether the information contained in the search warrant affidavit was so

stale as to render the search warrant invalid. Even if the search warrant was not based upon probable cause, the evidence obtained under the first search warrant could be admitted under the *Leon* good-faith exception to the warrant requirement. See *United States v. Leon,* 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405, *reh. denied* 468 U.S. 1250 (1984).

B. *Leon* Good-Faith Exception

Under *Leon*, the exclusionary rule of the Fourth Amendment to the United States Constitution should not be applied to bar the use of evidence obtained by law enforcement officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid. The *Leon* Court determined, however, that the exclusionary rule still applies in cases where: (1) the magistrate who issued the search warrant was deliberately misled by false information; (2) the magistrate wholly abandoned his or her detached or neutral role; (3) there was so little indicia of probable cause in the search warrant affidavit that it was entirely unreasonable for officers to believe the warrant was valid; or (4) the warrant so lacked specificity that officers could not determine the place to be searched or the items to be seized. *State v. Hoeck,* 284 Kan. 441, Syl. ¶ 1, 163 P.3d 252 (2007).

In adopting the good-faith exception in *Leon*, the United States Supreme Court expressed a "strong preference" for law enforcement officers' use of warrants in conducting a search. 468 U.S. at 914-17. The United States Supreme Court stated that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." 468 U.S. at 916. As a result, the suppression of evidence by officers acting in good faith in reasonable reliance on a search warrant issued by a neutral and detached magistrate does not further the purpose of the exclusionary rule under the Fourth Amendment to the United States Constitution. 468 U.S. at 916-17; *State v. Malm,* 37 Kan. App. 2d 532, 547, 154 P.3d 1154, *rev. denied* 284 Kan. 949 (2007).

In determining that the *Leon* good-faith exception did not apply in this case, the trial court found that the judge issuing the search warrant abandoned his neutral and detached role. The trial court

noted that too many times the issuing judge had been given a search warrant application at 1 a.m. and 2 a.m. and had not spent as much time as he should have in reviewing it. The trial judge further stated: "I would never say that [the issuing judge] would intentionally do something like this, but he can by not paying attention to the affidavit and not reading it as carefully as he should have abandoned his neutral and detached role and become a rubber stamp" for law enforcement. In addition, the trial court found that the search warrant was so facially invalid that no law enforcement officer could have relied upon it in good faith. Specifically, the trial judge stated: "I believe[] that the officer should have known that something four to five months old and that being the only . . . indicia of reliability or the . . . reason that they would find it there . . . should have known that wasn't going to fly."

In determining that the good-faith exception to the exclusionary rule did not apply, the trial court stated that under *Leon*, reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause. In *Hoeck*, however, our Supreme Court recently disapproved of this test and held: "The *Leon* good faith exception applies when an affidavit does not supply a substantial basis for the determination of probable cause but does provide some indicia of probable cause sufficient to render official reliance reasonable." 284 Kan. 441, Syl. ¶ 2.

Therefore, under *Hoeck*, this court must determine whether Dunn's affidavit for search warrant provided some indicia of probable cause sufficient to render official reliance reasonable. As discussed previously, this case presented a close question. The officers believed they were executing a valid warrant, and they did not act outside the scope of the warrant they possessed. The paddle that was seized was encompassed by the description in the warrant. Thus, the officers reasonably believed the paddle was seized under the authority of a lawfully issued search warrant. As a result, the information contained in the affidavit for search warrant provided some indicia of probable cause sufficient to render official reliance reasonable.

In summary, our reversal of this matter was not dependent upon whether the information contained in the first search warrant was so stale as to preclude probable cause. We reverse because, whatever label we place on the information contained in the first search warrant, the *Leon* exception to the warrant requirement allows the admission of the seized evidence.

Reversed and remanded for further proceedings.

PIERRON, J., dissenting: I respectfully dissent. As the majority ably points out in its opinion, this is a close question. It would appear this is the kind of question for which *United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984), was crafted. There is substantial evidence in support of probable cause, but there are some difficulties with making such a finding. Many search and seizure cases hinge on the individual facts. Such is the case here. There is no indication of an abandonment of neutrality by the magistrate. There is no showing of dishonesty by the police officers. I would sustain the original warrant.