NOT DESIGNATED FOR PUBLICATION

No. 127,541

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

MEGAN GARDNER,
*Appellee*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; CLINTON LEE, judge. Submitted without oral argument. Opinion filed September 12, 2025. Reversed and remanded with directions.

*Tyler W. Winslow*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellant.

*Kristen B. Patty*, of Wichita, for appellee.

Before PICKERING, P.J., ISHERWOOD and HURST, JJ.

PICKERING, J.:  This case concerns a district court's ruling that granted a defendant's motion to suppress evidence obtained from a search of the defendant's home. Following the search of Megan Gardner's home, the State charged Gardner with several drug-related crimes. Gardner moved to suppress the evidence, asserting the affidavit in support of the search warrant failed to provide a substantial basis for probable cause. The State now appeals, contending the affidavit did provide a substantial basis for probable cause and argues, for the first time on appeal, that the police reasonably relied on the search warrant under the good-faith exception established in *United States v. Leon*, 468 U.S. 897, 922-23, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). After reviewing the record,

1

while we find the district court did not err in finding the affidavit failed to provide a substantial basis for probable cause, we also find the *Leon* good-faith exception to the exclusionary rule does apply in this case. We therefore reverse and remand to the district court.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2023, the district court issued a search warrant for Gardner's home. In issuing the warrant, the district court relied on the following facts contained in Leavenworth Police Department Detective La Carol Kennedy's affidavit and application for search warrant.

*Probable Cause Affidavit*

Following a death due to a suspected fentanyl overdose, Kennedy "received information from within the Leavenworth Police Department and outside agencies that [the victim] purchased her illicit narcotics from 'David Kelly.'" Two weeks later, on March 25, 2023, "[d]etectives received an anonymous tip" that someone was "selling narcotics at . . . Columbia Ave[,] Leavenworth, KS 'out of a red car.'" Two days later, Kennedy received screenshots from a contact "of a conversation stating that [the victim] bought her narcotics from Kelly in Woodland Village before her OD." Woodland Village is an apartment complex in Leavenworth.

On March 29, 2023, using Woodland Village's surveillance system, Kennedy observed Kelly entering an apartment belonging to Christina Harris. Kennedy saw an unidentified individual exit the apartment and enter a maroon Ford Escape. That same day, Kennedy surveilled the Columbia Avenue address and saw the same Ford Escape—confirmed by the license plate number—parked outside a different address on Columbia Avenue.

2

On March 31, 2023, Kennedy observed a tan Infiniti sedan parked in front of the Columbia Avenue home. Kennedy saw an unidentified white female carrying items into the home. Also on that day, on Woodland Village's surveillance system, Kennedy saw the same car at Harris' apartment and saw the same female enter the apartment.

On Woodland Village surveillance footage captured from March 31 to April 2, 2023, Kennedy saw a gray Kia Soul bearing a temporary license plate and red heart on the rear window at Harris' apartment. The Kia Soul was registered to Gardner. Kennedy observed Kelly exit the apartment and enter the car's backseat "for several minutes." Kelly then exited the car and returned to the apartment. Kennedy saw an unidentified white male—later identified as Domonik Ham—driving the car.

While surveilling the Columbia Avenue home on April 3, 2023, Kennedy saw the same Kia Soul parked behind the home. Ham appeared to be getting in and out of the car and working on the engine. That same day, Kennedy saw two other vehicles arrive at the Columbia Avenue home. Two people entered and exited the home "within 2-4 minutes each." Kennedy believed this activity was "consistent and indicative of the sale/purchasing of narcotics." Later that day, Kennedy observed Kelly standing in front of the Columbia Avenue home talking on the phone. Kelly then went inside the home, after which Ham parked the Kia Soul in front of the home.

According to the affidavit, Ham was at the scene of two separate overdoses on April 6 and 7, 2023, where he told officers one person who overdosed "'could have taken some blues.'" Kennedy understood "'blues'" to be Percocet and knew overdoses in Leavenworth had "been linked to illegitimate Percocet 'M30' pills that contain Fentanyl."

On April 4, 2023, Kennedy saw a white woman with pink hair highlights—believed to be Gardner—exit the Columbia Avenue home and enter the Kia Soul. Later that day at the Columbia Avenue home, two people loaded items into the Kia Soul, after

3

which the car left the home. The car "was occupied by a light-skinned black or mixed female." Kennedy followed the car to Woodland Village; "[w]ithin minutes, the Kia again exited Woodland Village." Kennedy observed the car appearing to "'clean itself off,'" a practice where subjects "enter and leave parking lots abruptly in order to confirm or deny whether they are being followed or surveilled." The car travelled to another home where it picked up an unidentified black female, after which it returned to Woodland Village and "left within minutes." The car then returned to the Columbia Avenue home, dropped off "some occupants," and left.

On April 11, 2023, detectives cancelled an attempted trash pull at the Columbia Avenue home since the trash was not put out for pickup. That same day, another detective "received information linking Kelly to the purchase of a stolen firearm[.]" The witness in that case claimed Kelly bought a stolen handgun for $500 and 100 blue pills. The person suspected of initially stealing the gun told officers "Kelly had 'thousands of pills.'"

On April 14, 2023, Kennedy found out that Gardner's Kia Soul had been repossessed two days prior. Kennedy and another detective "processed the vehicle as part of intelligence gathering" and found, among other miscellaneous items, "[a] user amount of a green leafy substance contained within a corner-tie plastic baggie, a glass pipe with a rubber end, and a small round suction cup mirror with white residue[.]" The detectives also found Gardner's debit card and mail. The green leafy substance tested presumptive positive for marijuana, and the residue on the suction cup mirror tested presumptive positive for fentanyl.

On April 18, 2023, police conducted a trash pull at the Columbia Avenue home. The affidavit did not state who did the trash pull. Kennedy noted the following items found:

- Five plastic sandwich bags missing corners;

- two plastic sandwich bag corners;

- one small plastic sandwich bag with residue testing presumptive positive for fentanyl;

- two small plastic sandwich bags "attached at the opening as if purchased in bulk";

- one small "'snack size'" plastic bag;

- three "burnt, hand-rolled, cigarillo ends";

- one broken glass pipe inside a cigarillo wrapper with residue testing presumptive positive for methamphetamine;

- one loose green stem testing presumptive positive for marijuana;

- handwritten log "'dated 04.08'" containing names and money totals;

- three pieces of mail from Chase Bank addressed to Kelly at a different address;

- two pieces of mail addressed to Gardner at the Columbia Avenue home;

- bag of men's clothes; and,

- "several small plastic open-ended caps."

On April 20, 2023, Kennedy observed a black Cadillac Escalade and a silver Chevrolet Impala park at the Columbia Avenue home. The individuals walked up to the home and left after two to four minutes. Kennedy believed these events indicated narcotics sales.

Based on these facts, the district court issued a search warrant for Gardner's home on April 21, 2023.

*Search of Gardner's Home*

On April 25, 2023, police executed the search warrant. At that time, Gardner and another woman were at the home. Inside, police found digital scales and other indicia of drug distribution, baggies suspected to contain marijuana and fentanyl, blue pills imprinted with "M30," and various drug paraphernalia.

After twice amending the complaint, the State ultimately charged Gardner with one count of possession with intent to distribute methamphetamine, one count of possession with intent to distribute fentanyl, and one count of possession of drug paraphernalia.

*Motion to Suppress*

Gardner moved to suppress the items collected from her home, claiming "the search warrant did not contain sufficient probable cause." After hearing arguments on the motion, the district court agreed. The court found the affidavit and application for search warrant "mostly contains fluff and other meaningless observations. That is to say that most of the application's content describes totally lawful and innocent activities." The court, however, found three possible instances of suspicious activity: the "'trash pull,'" the search of Gardner's car, and the vehicle traffic at Gardner's home.

The district court concluded the description of the trash pull contained insufficient "factual details about the trash pull itself to allow a reviewing court to reasonably find a nexus between the contents of the trash bag(s) and . . . Columbia Avenue"; and "[t]he application does not explain how or why the affiant believes the trash in question was associated with . . . Columbia Avenue." The court noted several unanswered questions about the trash pull, including who placed the trash outside and when; where the trash was located; how many trash bags were involved; and whether anyone else handled the

6

trash after it was placed outside but before police searched it. The court also found the probative value of the mail addressed to Gardner was "negated by the lack of any additional details."

The district court likewise concluded the application failed "to sufficiently link the drugs in Gardner's car to Gardner." The court noted that the search occurred 10 days after Gardner was last seen driving the car and there was no surveillance of the car during those 10 days. The court found there was "no way to know who put the drug items in the car or how long these items were in there." The court also pointed out that Gardner did not exclusively drive the car. The court concluded that even if the drug items were linked to Gardner, the application did not connect any criminal activity to Gardner's home.

The district court also found that "[w]hile a high volume of vehicle or foot traffic to a home can be an indicator of drug activity, the information in the affidavit falls short of demonstrating a high volume of traffic." The court explained that the affiant did not state the time span during which cars arrived at the Columbia Avenue home. The court noted that there was "no evidence of any controlled buys or, frankly, any other drug-related activities." Therefore, the court suppressed all evidence collected as a result of the search warrant.

The State filed an interlocutory appeal from the district court's suppression ruling.

7

*The District Court Did Not Err in Finding the Affidavit Failed to Provide a Substantial Basis for Probable Cause*

*Jurisdiction*

The State brings this appeal under K.S.A. 22-3603, which states, in relevant part:

> "When a judge of the district court, prior to the commencement of trial of a criminal action, makes an order quashing a warrant or a search warrant, suppressing evidence or suppressing a confession or admission an appeal may be taken by the prosecution from such order if notice of appeal is filed within 14 days after entry of the order."

The Kansas Supreme Court has held that "pretrial orders of a district court which exclude [S]tate's evidence so as to substantially impair the [S]tate's ability to prosecute the case may be appealed by the [S]tate by interlocutory appeal." *State v. Newman*, 235 Kan. 29, Syl. ¶ 1, 680 P.2d 257 (1984). To ensure an interlocutory appeal is only taken in cases substantially impairing the State's ability to prosecute the case, "the prosecutor should be prepared" to show substantial impairment "either on order of the appellate court or when appellate jurisdiction of the interlocutory appeal is challenged by the defendant-appellee." 235 Kan. at 35.

In its brief, the State did not address whether the suppression order substantially impairs the State's ability to prosecute the case. Nor does Gardner challenge the State's ability to bring the interlocutory appeal. Still, we find that the suppression order substantially impairs the State's ability to prosecute the case.

*Standard of review*

"On a motion to suppress, an appellate court generally reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and reviews the ultimate legal conclusion de novo." *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021). In reviewing the factual findings, an appellate court does not reweigh the evidence or assess witness credibility. When the material facts supporting a district court's decision on a motion to suppress are not in dispute, the question of whether to suppress is a question of law over which appellate courts exercise unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). The State has the burden to prove the search and seizure were lawful. *State v. Goodro*, 315 Kan. 235, 238, 506 P.3d 918 (2022).

*Review of affidavit*

The State claims the affidavit "established a substantial basis for the magistrate to find probable cause to search" the home. Specifically, the State challenges the district court's review of the affidavit, asserting that the district court improperly ignored certain parts of the affidavit, and, thus, ran afoul of the deferential standard when reviewing search warrants. The State suggests that "[w]hen the entire affidavit is reviewed with the proper deference, it was sufficient to provide 'a substantial basis'" for probable cause.

Gardner responds that the district court correctly found no connection between the drug evidence discovered in the trash pull and Gardner's home. Gardner argues the affidavit raised "far more questions than it provided answers" and failed to state why Kennedy believed the trash was connected to Gardner's home. According to Gardner, the court correctly found no connection between the drug evidence found in Gardner's car and her home, and there was no indication of high-volume traffic at Gardner's home or other indication of criminal activity.

9

When, as here, the affidavit supporting a search warrant is challenged, "we need only see enough to persuade us that there was a substantial basis for the magistrate's conclusion" that probable cause existed. *State v. Hicks*, 282 Kan. 599, 613, 147 P.3d 1076 (2006). An appellate court "may perform its own evaluation of the affidavit's sufficiency" in providing "a substantial basis for the magistrate's determination that there is a fair probability that evidence will be found in the place to be searched." 282 Kan. 599, Syl. ¶ 2. "On review, a court's determination of the sufficiency of a search warrant affidavit must be determined from the four corners of the affidavit." *State v. Malm*, 37 Kan. App. 2d 532, 543, 154 P.3d 1154 (2007).

Our discussion of the affidavit will follow the order of the district court's decision granting the motion to suppress. First, the district court found that the affidavit "mostly contains fluff and other meaningless observations. That is to say that most of the application's content describes totally lawful and innocent activities." The district court noted that "[t]here are possibly three notable exceptions" and identified the trash pull on Columbia Avenue on April 18, 2023, the search of Gardner's vehicle on April 14, 2023, and two instances of suspicious vehicle traffic.

After discussion of the three possible exceptions, the district court returned to the remaining contents of the application. Noting the remaining paragraphs "include references to unreliable and/or uncorroborated sources, hearsay and speculation[,]" the court found the remaining paragraphs documented "observations of lawful, innocent and innocuous human activities." We agree with the district court that the affidavit contained mostly descriptions of lawful and potentially innocent activities. We disagree, however, with the district court's categorization of most of the affidavit as "fluff" and "meaningless." Lawful and potentially innocent activities, when combined with other information, can be sufficient to support a finding of probable cause. *United States v. Pickel*, 863 F.3d 1240, 1248 (10th Cir. 2017).

10

A.     *Trash pull*

The district court noted the affidavit described that "evidence of drugs and drug-related activities were found in the trash, and two pieces of mail addressed to Gardner at . . . Columbia Avenue were also found." But the district court believed the affidavit raised "far more questions than it provides answers." For example, the district court noted the affidavit was silent on where the trash was located; who placed the trash outside; when the trash was placed outside; whether the trash was loose or in bags; how many bags were searched; and whether Gardner's mail was in the same bag as the evidence of drug-related activity.

The district court relied in part on *Zuniga-Rodriguez v. State*, No. 121,441, 2020 WL 5079948 (Kan. App. 2020) (unpublished opinion), to determine the trash pull did not establish a nexus between the drug-related items and Gardner's residence. Zuniga-Rodriguez claimed his trial counsel was ineffective because counsel did not move to suppress evidence seized from a trash pull at his house. During the trash pull, the officers removed three trash bags and found plastic bag corners and a small zip lock bag containing methamphetamine residue. They also found mail addressed to Zuniga-Rodriguez in the trash bags.

The *Zuniga-Rodriguez* panel found "nothing in the affidavit for the search warrant that connects the indicia of residence with the contraband." 2020 WL 5079948, at *5. "There is no indication that the indicia of residence and the contraband were found in the same bags," nor was there "information in the affidavit regarding surveillance of the trash receptacle to dispel the possibility that a nonresident of the house could have placed contraband in the bin." 2020 WL 5079948, at *5. The mail found in the trash showed Zuniga-Rodriguez was residing at a different address. Additionally, the drug items found in the trash pull only indicated prior use, not continued presence of contraband in the home. Finally, the affidavit contained no information on who placed the trash on the

curb, when the trash was placed there, or where the trash was kept. Thus, the panel concluded the affidavit failed to establish probable cause. 2020 WL 5079948, at *6-7.

The district court also cited *State v. Malone*, 50 Kan. App. 2d 167, 323 P.3d 188 (2014). There, a detective searched a trash can at Malone's curb and found suspected marijuana plants, a glass pipe with marijuana residue, an empty fertilizer jug, and other evidence of marijuana cultivation. In a separate bag, the detective found mail addressed to someone at Malone's home. The affidavit did not indicate anyone observed a resident place the bag containing drug evidence into the trash. Malone moved to suppress, and the district court granted his motion.

On appeal, the *Malone* panel also concluded no surveillance evidence connected the trash bags with the people living at the home and there was no evidence of illegal activity at the home. 50 Kan. App. 2d at 174. The panel affirmed the district court's suppression of evidence. 50 Kan. App. 2d at 175.

In *Hicks*, the search warrant affidavit described two trash pulls, both of a single trash bag, from behind Hicks' home. In both trash pulls, police found brown and green stems and seeds that field-tested positive for marijuana. The affidavit did not identify any evidence in the bags of Hicks' residency, nor did the affidavit indicate who placed the bags in the trash. The *Hicks* court concluded the description of the trash pull did not provide a substantial basis for probable cause because "some evidence establishing a nexus between drug evidence discovered in a garbage bag and a residence to be searched is necessary to support the conclusion that the drug evidence came from the home." 282 Kan. at 617.

Our review of the affidavit here reaches the same conclusion as these cases. There was no indication of how the trash was contained, whether in bags or loose in a trash can. The affidavit did not establish that Gardner or another resident of the home placed the

12

trash out for pickup. While the trash pull revealed two pieces of mail addressed to Gardner at the Columbia Avenue home, the affidavit's discussion of the trash pull contains limited information linking the trash to Gardner's residence. Thus, the trash pull does not contribute to the strength of the affidavit overall.

### B.    *Drugs found in Gardner's car*

Kennedy's affidavit also stated that she and another officer searched Gardner's car after it had been repossessed. The search occurred 10 days after Gardner was last seen driving the car. From their car search, the officers found user amounts of drugs.

In *State v. Doile*, 244 Kan. 493, 769 P.2d 666 (1989), police found a mirror, a partial marijuana cigarette, and a baggie of marijuana after stopping Doile's car. While searching Doile's personal effects after his arrest, officers found a straw inside Doile's billfold that contained trace amounts of cocaine. Based on this information and Doile's prior drug-related convictions, police obtained a search warrant for Doile's home and found additional drug evidence. On appeal, the Supreme Court concluded the affidavit did not provide probable cause for a search warrant because no facts indicated drug activity at Doile's house. 244 Kan. at 501.

In *Malm*, after receiving a report of suspicious pseudoephedrine purchases, officers followed Malm. The officers observed suspicious driving behavior and stopped Malm. Following his arrest for a probation violation, the officers searched his vehicle incident to his arrest. Inside, they found tablets with pseudoephedrine, coffee filters, a syringe, and small baggies suspected to contain methamphetamine. The officers obtained a search warrant for Malm's home. There, they found methamphetamine and evidence of methamphetamine manufacture.

On appeal, the panel found the only evidence connecting Malm's suspicious activity to his home was speculation that Malm avoided driving home, believing he was being followed. The panel held this activity was insufficient to establish probable cause because holding otherwise would mean "a nexus to the suspect's residence could be established in almost every case where the suspect is arrested while driving a vehicle, rendering this important requirement for probable cause almost meaningless." 37 Kan. App. 2d at 546.

The reasoning in *Doile* and *Malm* is instructive here. The affidavit's allegation that there was a "user amount" of drugs, a glass pipe, and a round suction cup with white residue that tested presumptively positive for fentanyl in Gardner's car does not connect any illegal activity to Gardner's home. The search occurred 10 days after Gardner was last seen driving the car, and she was not the exclusive driver of the vehicle. The vehicle contained a debit card and mail belonging to Gardner, but nothing in the affidavit ties the drugs and paraphernalia to Gardner. Under these circumstances, the affidavit's description of the search of Gardner's car did not provide a sufficient connection between any illegal activity and Gardner's home.

C.     *Volume of traffic at Gardner's home*

The affidavit in this case also claimed individuals visited Gardner's home and engaged in purportedly suspicious behavior. These individuals were largely unidentified. From the two days that Kennedy surveilled Gardner's home, she noted two vehicles stopped briefly at Gardner's residence, and, within a span of two to four minutes, individuals entered and exited the residence and then drove away.

The Kansas Supreme Court considered an affidavit's description of visitors to a suspect's home in *Hicks*. There, the affidavit claimed that "over the 'past several weeks,'" police saw three people go to Hicks' house. 282 Kan. at 616. Two of those three people

14

had prior drug convictions. One person with a prior drug conviction visited the house twice in one day. The other person with a prior drug conviction went to the house twice in two weeks. The *Hicks* court found a "handful of visits" insufficient to show "a 'protracted or continuous course' of traffic indicating drug-related activity." 282 Kan. at 616. Further, no evidence indicated any visitors carried suspicious packages or that Hicks was home during these visits. 282 Kan. at 616.

Similarly, the affidavit prepared by Kennedy described two days where she saw individuals arrive at Gardner's home and leave within minutes. The affidavit did not identify who these individuals were, and, despite surveilling Gardner's house at least six times over the course of nearly three weeks, the affidavit only identified four instances when an individual approached Gardner's home and left within a few minutes. As in *Hicks*, this "handful of visits" does not show "a 'protracted or continuous course' of traffic indicating drug-related activity." 282 Kan. at 616.

D.     *The remaining content of the affidavit*

Kennedy's affidavit also described five instances of cars—including Gardner's car—travelling between Woodland Village and Columbia Avenue with individuals carrying unidentified items in and out of the homes over about three weeks. The affidavit does not describe the unknown items.

The affidavit outlined one instance where Gardner's car appeared to "clean itself off." Kennedy described this as entering and exiting several parking lots without anyone exiting the vehicle and described it as a "common practice used by subjects" to determine if they are being followed. The affidavit did not identify who was driving the car at this time; it only stated the car "was occupied by a light-skinned black or mixed female." Gardner is white.

15

The affidavit also identified an anonymous tip regarding "an individual selling narcotics at . . . Columbia Ave . . . 'out of a red car.'" Kennedy's affidavit noted the presence of a maroon Ford Escape outside Woodland Village, and Kennedy indicated she also observed the same maroon Ford Escape parked down the street from Gardner's house. Gardner's Kia Soul was grey.

*State v. Barnes*, No. 114,125, 2016 WL 7031847 (Kan. App. 2016) (unpublished opinion), is analogous to this case. In *Barnes*, multiple confidential informants claimed Arthur Adams was selling drugs. While surveilling Adams, police watched him visit multiple homes and drive in a way "believed to be consistent with both drug sales and counter-surveillance tactics." 2016 WL 7031847, at *1. Barnes' home was among those Adams visited. Police also got an anonymous tip that "Barnes was going to Wichita to buy drugs and that she was 'possibly' selling methamphetamine from [her home]." 2016 WL 7031847, at *1. After police observed Adams leave Barnes' home and go to other places where they suspected drug sales took place, police "concluded that Barnes was likely acting as a supplier of drugs to Adams, who then sold them . . . ." 2016 WL 7031847, at *1.

Officers conducted a trash pull at Barnes' address. They found mail addressed to Barnes at her house, a broken glass pipe, a small baggie that field-test positive for methamphetamine, used syringes, and baggies with the corner torn off. Officers applied for a warrant and searched Barnes' home. After finding methamphetamine, Barnes was arrested and charged with possession of methamphetamine and possession of drug paraphernalia. She moved to suppress the evidence seized from her house. The district court denied her motion.

On appeal, the *Barnes* panel concluded the affidavit failed to establish probable cause justifying a search warrant for Barnes' home. The affidavit did not state why the anonymous tipster believed "Barnes was 'possibly' selling methamphetamine . . . ,

whether the information was known personally by the informant or was information the informant learned from . . . others, when he or she gained the knowledge conveyed in the tip, or how recently the tip was received . . . ." 2016 WL 7031847, at *4. Nor did the affidavit state why the officers thought Adams' visits to Barnes' home indicated drug trafficking. The panel noted the trash pull could have supported a probable cause finding, but the affidavit lacked "fundamental information about the trash pull" to connect it to Barnes' residence. 2016 WL 7031847, at *5. The panel found the affidavit "long on conclusory statements . . . and short on factual support for the claims made about Barnes' involvement in what [police] thought Adams was doing." 2016 WL 7031847, at *5.

Similar to *Barnes*, the affidavit in this case included tips—albeit some from named individuals—implicating Gardner's home and Kelly in drug activity. But, as in *Barnes*, the affidavit did not indicate any basis of knowledge for these claims or indicate when these individuals gained the knowledge stated in the tips. From the affidavit, it is unclear how the tipsters knew the information they conveyed. The affidavit did not describe regular visits by Kelly or Ham. While there were some instances of visitors arriving and leaving within a few minutes, these instances were far apart and infrequent. As in *Barnes*, the trash pull failed to establish a sufficient connection between the drug evidence found and Gardner's home; the same was true of the search of Gardner's car. Therefore, the district court did not err in concluding the affidavit failed to provide a substantial basis for probable cause to search Gardner's home.

*The* Leon *Good-Faith Exception Applies*

The State argues for the first time on appeal that it may raise the *Leon* good-faith exception to the exclusionary rule.

First, a short background on the exclusionary rule. The exclusionary rule was created "to deter unlawful searches and seizures by prohibiting the prosecution's use of

unconstitutionally obtained evidence." *State v. Perkins*, 310 Kan. 764, 767, 449 P.3d 756 (2019). The *Leon* good-faith exception renders an officer's reliance on a faulty search warrant reasonable if the search warrant affidavit provides some indicia of probable cause and the officer executed the warrant in good faith. 468 U.S. at 922-23; *State v. Zwickl*, 306 Kan. 286, 294-95, 393 P.3d 621 (2017).

Generally, we will not review an unpreserved issue for the first time on appeal, subject to three exceptions: (1) "'The newly asserted claim involves only a question of law arising on proved or admitted facts'" and is determinative of the case; (2) consideration of the theory "'is necessary to serve the ends of justice or to prevent the denial of fundamental rights'"; and (3) the trial court may be affirmed because it was right for the wrong reason. *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021). The State contends this issue is a question of law and thus meets the first of the preservation rule's three exceptions. Under this exception, the State asserts that we can consider this issue.

Kansas courts have applied the *Leon* good-faith exception when the State's argument only involves a question of law. See *State v. Daniel*, 291 Kan. 490, 496, 242 P.3d 1186 (2010). This court has also applied the exception for the first time on appeal when "the State's good-faith argument involves only a question of law[.]" *State v. Schmidt*, 53 Kan. App. 2d 225, 233, 385 P.3d 936 (2016). In *Schmidt*, the panel considered "whether the good-faith exception to the exclusionary rule should apply to warrantless blood tests as authorized by the Kansas Implied Consent Law prior to the holding in *Birchfield*[ *v. North Dakota*, 579 U.S. 438, 476, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016)]." 53 Kan. App. 2d at 233. Important to this discussion, the *Schmidt* panel noted that there were no disputed facts and the defendant "made no argument as to why the case must be remanded to the district court to hear additional evidence." 53 Kan. App. at 232.

The State relies on *Schmidt* in support of its contention that we can consider this issue for the first time on appeal. It contends that "the facts surrounding good faith are not contested," and, thus, this is a question of law. In her response, Gardner does not argue there are disputed facts or provide any arguments in support of remanding the case to the district court for additional evidence. Instead, Gardner argues that reviewing an unpreserved issue is a prudential decision and the State had the opportunity to raise the good-faith exception at the district court.

From our review of the record, the issue of whether the *Leon* good-faith exception applies involves only a question of law. At the suppression motion hearing, both parties relied on the affidavit's factual basis without support from any testimonial witnesses. Without witnesses, the parties focused on how much weight should be given for the affidavit's factual basis. We therefore find that this issue is a question of law and will consider whether the exclusionary rule's good-faith exception applies. See *Zwickl*, 306 Kan. at 293-94. Because this issue is a question of law, we have unlimited review. *State v. Carlton*, 297 Kan. 642, 645, 304 P.3d 323 (2013).

When applying the *Leon* good-faith exception to the exclusionary rule, we must determine "'whether it was entirely unreasonable for the officers to believe the warrant was valid.'" *Zwickl*, 306 Kan. at 295. An appellate court looks at the entirety of the affidavit and determines "'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" 306 Kan. at 295. The good-faith exception may be invoked when "the affidavits do not provide a substantial basis for the determination of probable cause but do provide some indicia of probable cause that is sufficient to render official reliance reasonable." *State v. Hoeck*, 284 Kan. 441, 453, 163 P.3d 252 (2007). When the nexus between the place searched and the suspected criminal activity is at issue, the good-faith exception also may apply if the affidavit establishes "a 'minimal nexus between the place to be searched and the suspected criminal activity.'" *Zwickl*, 306 Kan. at 295.

The good-faith exception does have its limitations and will not apply:  (1) if the magistrate "'was deliberately misled by false information'"; (2) if "'the magistrate wholly abandoned [a judge's] detached or neutral role'"; (3) if "'there was so little indicia of probable cause in the affidavit that it was entirely unreasonable for the officers to believe the warrant was valid'"; and (4) if the warrant was so lacking in "'specificity that officers could not determine the place to be searched or the items to be seized.'" 306 Kan. at 292.

Here, none of the four exceptions to *Leon* were applicable under the facts of the case. As a reminder, at the motion suppression hearing, Gardner never called Kennedy to testify in order to challenge Kennedy's affidavit statements. At that same hearing, Gardner did not argue that the affidavit contained false or misleading statements. She also did not assert that pertinent information was withheld from the affidavit. Gardner did not contend that the issuing judge had wholly abandoned his or her neutral and detached role. Last, she never claimed that the warrant was lacking in specificity. In briefing, Gardner listed all four good-faith exceptions without asserting that any of the exceptions were applicable.

Given the above, none of the four limitations on the good-faith exception are present here. We therefore will consider the circumstances in determining whether "'it was unreasonable for the officer executing the warrant not to override the determination of probable cause found by the issuing district judge and refuse to execute the warrant.'" *Hoeck*, 284 Kan. at 456.

Again, *Malm* is instructive here. There, the panel found the good-faith exception applied to save the affidavit's shortcomings in establishing probable cause. 37 Kan. App. 2d at 549. As discussed, after discovering drugs and paraphernalia in Malm's vehicle, the officers requested a warrant for Malm's home, where they found methamphetamine and evidence of methamphetamine manufacturing. On appeal, the panel found the evidence connecting Malm's suspicious activity to his home did not establish a fair probability that

20

evidence of a crime would be found in Malm's home. 37 Kan. App. 2d at 548-49. Nonetheless, it determined that the affidavit contained "some evidence of a nexus between Malm's criminal activity and his residence, mainly that Malm was attempting to avoid leading the officers to his residence and that Malm lied to the officers concerning the location of his residence." 37 Kan. App. 2d at 548. The panel found "the search warrant affidavit was not completely devoid of any evidence of a nexus" and concluded it was "precisely the type of situation in which the *Leon* good-faith exception was intended to be applied." 37 Kan. App. 2d at 548.

The State asserts that, even if the affidavit did not provide a substantial basis for probable cause, the affidavit contained sufficient indicia of probable cause to allow a reasonable officer to rely on the warrant. The State suggests that applying the exclusionary rule "furthers no deterrent effect in this case and should not be applied."

Gardner counters that the good-faith exception is inapplicable. Gardner argues that the district court's ruling "effectively concluded that the Leon good faith exception would not apply." Yet, we do not read the district court's ruling in the same way. In concluding its discussion of the affidavit's contents, the district court stated:  "The bottom-line is that considering the totality of the circumstances set forth in the four corners of the application, the application simply fails to offer up a substantial basis for concluding that evidence of illegal activity would be located at . . . Columbia Avenue." The district court's order mirrors the standard a reviewing court uses to review the sufficiency of an affidavit, not the standard for whether the good-faith exception to the exclusionary rule applies.

Like *Malm*, the affidavit in this case contained at least some evidence of a connection between drug activity and Gardner's home. Kennedy observed some instances of people visiting Gardner's home and leaving within a few minutes. Ham—the person present at two overdoses—was at Gardner's home, and Kennedy saw him drive Gardner's

21

car. Kennedy also noted Kelly was at Gardner's home and drove Gardner's car. Another time, Kennedy observed an unknown driver attempt to avoid surveillance, after which the car went to Gardner's home and dropped several people off. The trash pull revealed drug evidence and contained mail addressed to Kelly and Gardner. Kennedy discovered "user amounts" of drugs and other paraphernalia in Gardner's vehicle. These facts indicate at least some indicia of probable cause. It would have been unreasonable for the detective to override the issuing judge's determination of probable cause. As such, we find "'no bad faith or wrongdoing shown in the issuance or execution of the warrant.'" *Hoeck*, 284 Kan. at 456. Therefore, the officers' reliance on the warrant was not entirely unreasonable, and the *Leon* good-faith exception to the exclusionary rule applies.

Because we find that the *Leon* good-faith exception applies, we reverse the district court's granting of Gardner's motion to suppress and remand for further proceedings.

Reversed and remanded with directions.

\* \* \*

HURST, J., dissenting:  I disagree with the majority's decision to consider the application of the good-faith doctrine for the first time on appeal.

As the majority notes, the *Leon* good-faith doctrine can apply to prevent application of the exclusionary rule to evidence obtained through an illegal search when an officer acts in objectively reasonable reliance on an invalid search warrant. *State v. Zwickl*, 306 Kan. 286, 294-95, 393 P.3d 621 (2017); see *United States v. Leon*, 468 U.S. 897, 922-23, 104 S. Ct. 3405, 82 L.Ed.2d 677 (1984). Kansas appellate courts use a bifurcated standard when reviewing the district court's decision regarding application of the good-faith doctrine. *Zwickl*, 306 Kan. at 293. This means the appellate inquiry involves a review of the district court's factual determinations related to the doctrine in addition to a de novo legal review.

When the material facts are undisputed and the only question remaining is a legal one, appellate review is de novo. See *Zwickl*, 306 Kan. at 293. The majority relies on language from *Zwickl* to apply de novo review here—but in *Zwickl*, the district court had ruled on application of the good-faith doctrine—unlike in this case. See 306 Kan. at 290. The Kansas Supreme Court found that the Court of Appeals panel did not err in applying de novo review "because the argument was limited to whether there was probable cause to issue the warrant." 306 Kan. at 293. In *Zwickl*, the district court considered the good-faith exception and made factual and legal findings accordingly; and the court specifically found that the good-faith doctrine could not save the warrant because of the third exception to the doctrine. See 306 Kan. at 290. The district court found that the officers' statements in the affidavit suggested the officers knew or should have known their information was lacking, and it explicitly found that the search warrant had "so little indicia of probable cause that it [was] entirely unreasonable for an officer to believe the warrant [was] valid." 306 Kan. at 290. Given that ruling, the Court of Appeals panel found the question on appeal was whether the good-faith doctrine or its exceptions applied as a matter of law. See *State v. Zwickl*, No. 113,362, 2016 WL 556292, at *4 (Kan. App. 2016) (unpublished decision). Unlike in *Zwickl*, the district court here never ruled on the applicability of the good-faith doctrine or its exceptions, and the State never requested it do so.

The State also compares this case to one where a panel of this court held that the good-faith exception could be applied for the first time on appeal when it involved only a question of law. *State v. Schmidt*, 53 Kan. App. 2d 225, 232, 385 P.3d 936 (2016). Once again, *Schmidt* is distinguishable because in that case additional facts could not be presented to undermine the good-faith doctrine. After an injury motor vehicle accident, Schmidt was arrested on suspicion of driving under the influence and the arresting officer requested that Schmidt submit to a blood test and told him, consistent with the then applicable implied consent law, that failure to consent constituted a separate crime. Schmidt agreed to the blood test but then moved to suppress the results, which the district

23

court denied. At the time of Schmidt's arrest, the implied consent advisories the officer used were the law of the land but several years later, and after initial briefing on appeal, both the Kansas Supreme Court and the United States Supreme Court issued opinions undermining the constitutionality of those advisories. See *State v. Ryce*, 303 Kan. 899, 368 P.3d 342 (2016); *Birchfield v. North Dakota*, 579 U.S. 438, 136 S. Ct. 2160, 195 L.Ed.2d 560 (2016).

Unlike here, in *Schmidt*, the State had no reason to argue the good-faith exception to the district court. In fact, it was only after the United State Supreme Court's decision in *Birchfield* that the panel of this court issued its first show cause order to the parties "as to why Schmidt's case should not be summarily reversed and remanded for a new trial in light of the [United States Supreme] Court's holding about warrantless blood tests." *Schmidt*, 53 Kan. App. 2d at 230 (citing *Birchfield*, 579 U.S. 476). Given the change in law pending Schmidt's appeal, the panel issued a second show cause order and requested briefing on application of the good-faith doctrine, demonstrating the difficulty with applying the exception for the first time on appeal. See *Schmidt,* 53 Kan. App. 2d at 230. Only after that additional briefing did the panel determine there would be no additional disputed facts to prevent the panel's application of the good-faith doctrine to the stipulated facts. That has not occurred here.

The facts supporting application of the good-faith doctrine in *Schmidt* were different than in this case. Inquiry into those facts is necessary because they could demonstrate circumstances in which the good-faith doctrine cannot save a search conducted pursuant to an invalid warrant, including when:

> "(1) the magistrate issuing the warrant was deliberately misled by false information; (2) the magistrate wholly abandoned [a judge's] detached or neutral role; (3) there was so little indicia of probable cause contained in the affidavit that it was entirely unreasonable for the officers to believe the warrant was valid; or (4) the warrant so lacked specificity

24

that officers could not determine the place to be searched or the items to be seized." *State v. Hoeck*, 284 Kan. 441, 463–64, 163 P.3d 252 (2007) (adopting *Leon* and its exceptions as the law in Kansas).

In *Schmidt* the district court upheld the warrantless search—which the law at the time supported—but the law changed years later, while the appeal was still pending, making the search illegal. Thus, the panel relied on the law enforcement officer's good-faith, reasonable reliance on a statute that was later determined unconstitutional. 53 Kan. App. 2d at 237. In this case, the district court found the search was illegal at the time, and the State seeks to rely on the law enforcement officer's good-faith, reasonable reliance on the validity of an invalid warrant to save the illegal search. Unlike in *Schmidt*, the good-faith exception sought to be applied here to save an invalid warrant would involve engaging "*in fact finding* when deciding if the magistrate issuing a warrant was deliberately misled or had wholly abandoned the neutral and detached role expected from a judge." (Emphasis added.) *Zwickl*, 306 Kan. at 293. The district court here had no reason to engage in such fact-finding because the State did not rely on the good-faith doctrine at the district court.

Therefore, Gardner had no reason to present evidence negating application of the good-faith doctrine when the State never argued for its applicability. The lack of facts supporting or refuting the good-faith doctrine is merely a product of the State's failure to argue its application in the district court and, in my opinion, cannot be used to find that no evidence exists undermining its application. As the majority notes, the State had the burden to prove that its search and seizure was lawful. *State v. Goodro*, 315 Kan. 235, 238, 506 P.3d 918 (2022); *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016). The State also has the burden to prove facts warranting application of the good-faith doctrine. *State v. Posa*, 61 Kan. App. 2d 250, 259, 500 P.3d 1212 (Kan. App. 2021); see *Leon*, 468 U.S. at 924 ("[T]he prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time."). Here, it appears

that the majority argues Gardner had a duty to set forth facts on appeal refuting the State's appellate argument for the application of the good-faith exception—but those facts are supposed to be presented for the district court's consideration.

Generally, issues not presented to the district court are not reviewed for the first time on appeal because, in part, presenting an argument for the first time on appeal prevents one party from developing relevant facts. The State argues this court should rely on a prudential exception permitting review of an issue raised for the first time on appeal when the issue involves only a question of law arising on proven or admitted facts and it is finally determinative of the case. See *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). The State claims there are no facts refuting the good-faith doctrine—but if true, that is arguably because Gardner had no reason to present evidence refuting application of the good-faith doctrine to the trial court when the State never invoked it.

If the district court had made findings and a conclusion as to the application of the good-faith doctrine and the established facts were undisputed on appeal, review of the remaining legal question would be de novo. But the State failed to raise the theory at the district court, and application of the good-faith doctrine requires some factual determinations by the district court. See, e.g., *State v. Barnes*, No. 114,125, 2016 WL 7031847, at *5 (Kan. App. 2016) (unpublished opinion) ("Application of the good faith exception is not properly presented for the first time on appeal."); *State v. Baskas*, No. 109,760, 2014 WL 3843088, at *9 (Kan. App. 2014) (unpublished opinion) ("This may well be a case where the *Leon* good-faith exception is applicable to the police search of Baskas' residence. However, this determination must first be made by the district court before it can be reviewed on appeal."). Ruling on this question now deprives Gardner of the opportunity to present evidence related to the officers' good-faith reliance on the invalid warrant and deprives the district court of the opportunity to weigh the credibility of that evidence and make a related finding. Therefore, I must dissent.